TRAYLOR, Justice.*
11 Joshua Forbes was injured when the car he was riding in as a passenger left Greenwell Springs Road (“Highway 37”), traveled into a ditch and struck trees. A jury found the driver of the car to be 60% at fault for the accident; and the State of Louisiana, through the Department of Transportation and Development (“DOTD”) to be 40% at fault for the accident. The trial court granted the DOTD’s motions for judgment notwithstanding the verdict (“JNOV”), and, alternatively, granting a new |?trial on the issue of DOTD’s liability for the accident. The court of appeal reversed the trial court’s granting of the DOTD’s motions for JNOV and reinstated the jury’s verdict.
We granted the writ applications of the DOTD and its excess insurer, National Union Fire Insurance Company of Pittsburgh, PA (“National Union”), to determine if the design and/or maintenance of Louisiana Highway 37 was a legal cause of the accident such that liability should be imposed on the DOTD for damages sustained by Joshua Forbes. After reviewing the record and the applicable law, we re *842 verse the ruling of the court of appeal and reinstate the trial court’s judgment granting the DOTD’s motion for JNOV and, alternatively, for new trial, concluding that the driver of the vehicle in which Joshua Forbes was riding was 100% at fault for the accident.
FACTS AND PROCEDURAL HISTORY
Events Prior to the Accident
On Friday, March 18, 1994, Rodney Cockerham (“Mr. Cockerham”) worked the night shift and additional overtime at his place of employment in Slaughter, Louisiana, leaving work at 3:30 a.m. on Saturday, March 19, 1994. He then drove for about an hour to his mother’s house near Clinton, Louisiana, where he was living. At that time, besides himself, Mr. Cocker-ham’s girlfriend, Angela Simonson, was also living with Mr. Cockerham’s mother, Linda Cockerham. Mr. Cockerham testified he did not get to bed until 5:00 a.m.
On Saturday morning, at approximately 10:30 a.m., Mr. Cockerham was awakened by his nine year old nephew, Joshua Forbes. Joshua’s parents are Belinda Forbes and George Forbes, Mr. Cocker-ham’s step-brother.[1] Linda Cockerham is Joshua’s grandmother. Belinda Forbes had dropped off Joshua at his grandmother’s |shouse the previous evening so that Mr. Cockerham could take care of Joshua that Saturday.
After eating, both Mr. Cockerham and Joshua Forbes went outside to work on a three-wheeler. At some time between 12:00 noon and 1:30 p.m., Mr. Cockerham ate lunch. Mr. Cockerham testified that he drank two beers in this time period. Thereafter, Mr. Cockerham, Joshua Forbes, and Angela Simonson watched television and eventually decided to visit Mr. Cockerham’s step-brother, Thomas Forbes, who lived a short distance away.
Mr. Cockerham drove Angela Simonson, Joshua Forbes and himself to Thomas Forbes’ home in his 1993 two-door Geo Storm. They arrived at approximately 5:30 p.m. and found that Thomas Forbes had others visiting, including Darren Yates, and two girls, one named Sherry and the other named Monica. Certain of these individuals were playing cards and the rest were watching the card game. Mr. Cockerham testified that at some point after arriving at Thomas Forbes’ house, his girlfriend, Angela Simonson, and Joshua Forbes asked Mr. Cockerham to go to a nearby convenience store to purchase a candy bar and a cold drink for them. Mr. Cockerham complied and left to purchase candy bars and cold drinks for Angela Simonson, Joshua Forbes and himself. Joshua Forbes testified that before Mr. Cockerham went to the store, Mr. Cockerham and Thomas Forbes argued about Thomas Forbes’ refusal to take Mr. Cockerham with him to a bar which Thomas Forbes planned to visit that evening.
Mr. Cockerham left Thomas Forbes’ house and drove to Fleniken’s Store, located nearby on Highway 37, a two lane roadway. Mr. Cockerham went into the store and purchased three cold drinks and three candy bars. Mr. Cockerham testified that he did not recall purchasing any alcoholic beverages at that time. When Mr. |4Cockerham exited the store, he ran into his cousin, Keith Cockerham. Both Mr. Cockerham and Keith Cockerham also encountered acquaintances of both men in the parking lot, including Toby Scott, *843 Shane Blankenship and Wade Sonnier. The men talked outside in the parking lot and continued to do so even when the convenience store closed at 7:00 p.m.
Mr. Cockerham testified that while the men were talking in the parking lot, they were all drinking beer. However, Mr. Cockerham did not recall drinking anything alcoholic at that time. Toby Scott, one of the men in the parking lot, testified that both Mr. Cockerham and Keith Cock-erham were drinking alcoholic beverages as they talked with him and the others. Specifically, Toby Scott recalled that Mr. Cockerham had a beer in his hand when everyone was getting into vehicles to leave the parking lot. Keith Cockerham testified that Mr. Cockerham drank no alcoholic beverage while standing and talking with the other men in the parking lot.
Shortly after 7:00 p.m., the girl named Monica drove Angela Simonson and Joshua Forbes to the store to find Mr. Cocker-ham. Monica dropped Angela Simonson and Joshua Forbes off at the store’s parking lot. Joshua Forbes testified that when he arrived at the parking lot he saw four six-packs of beer sitting in the back of the pick-up truck Mr. Cockerham and the other men were grouped around. Joshua Forbes testified that all of the men, except Mr. Cockerham, were drinking beer and passing around a glass bottle with brown liquid. However, Joshua Forbes further testified that he did not watch the men the entire time they stayed in the parking lot because part of that time he was sitting in the back seat of Mr. Cockerham’s car.
Just before 8:00 p.m., Mr. Cockerham and the other men decided to leave. While Mr. Cockerham testified that he cannot remember anything that happened from the time when Angela Simonson and Joshua Forbes arrived at the store’s parking lot Isuntil he was at a hospital later that night, Mr. Cockerham also testified that he remembered leaving the parking lot to go to Thomas Forbes’ house. In fact, Mr. Cockerham testified that everyone had decided to return to Thomas Forbes’ house to play cards. Joshua Forbes, Keith Cock-erham and Toby Scott disagreed, each testifying that everyone was going to Toby Scott’s for a barbeque. In any case, Wade Sonnier, Toby Scott and Shane Blankenship got into Wade Sonnier’s pick-up truck while Angela Simonson, Joshua Forbes, and Keith Cockerham got into Mr. Cocker-ham’s Geo Storm. The two vehicles left the store’s parking lot and proceeded south on Highway 37. Wade Sonnier’s pick-up truck left the parking lot first; Mr. Cockerham’s car left after the pick-up truck. Mr. Cockerham was driving his car with Angela Simonson in the front passenger seat. Joshua Forbes rode in the rear passenger-side seat of Mr. Cockerham’s car and Keith Cockerham rode in the rear driver-side seat. None of the occupants of Mr. Cockerham’s car put on their seatbelts prior to leaving the store parking lot.
The Accident and Subsequent Investigation Into Its Cause

Lay Testimony Regarding the Accident

As both vehicles proceeded south on Highway 37, Toby Scott was riding in the front passenger seat of Wade Sonnier’s pick-up truck. As a result, Toby Scott was able to testify that Wade Sonnier reached a speed of 65 miles per hour in the truck after leaving the parking lot. Thereafter, while en route on the two lane highway, Mr. Cockerham passed Wade Sonnier’s pick-up truck. Toby Scott estimated Mr. Cockerham’s speed during this passing maneuver as approximately 90 miles per hour. Toby Scott indicated that he thought Mr. Cockerham was showing off and trying to impress the truck’s occupants when he passed their vehicle.
*844 Keith Cockerham testified that once they left the parking lot in Mr. 1 fiCockerham’s car, Mr. Cockerham caught up to Wade Sonnier’s truck and passed the truck going 100 miles per hour. Keith Cockerham indicated that he saw Mr. Cockerham’s car speedometer in confirming the speed.
Mr. Cockerham was unable to testify as to the speed of his car during his passing of Wade Sonnier’s pick-up truck because he claimed that he could not remember anything about the accident or events leading up to the accident after everyone left the convenience store’s parking lot. Joshua Forbes testified that he does not recall Mr. Cockerham’s driving speed after leaving the parking lot.
Once Keith Cockerham realized the speed at which Mr. Cockerham was driving, Keith Cockerham yelled at Mr. Cock-erham to slow down. Keith Cockerham stated that Mr. Cockerham took his foot off the gas pedal in response but continued to drive well in excess of the road’s 45 miles per hour speed limit.
Keith Cockerham further testified that, while driving south on Highway 37, Mr. Cockerham was also straightening out the curves in the road by driving in the opposing, northbound lane of the two lane highway as he approached each curve. Mr. Cockerham drove through five curves before coming to the accident site. Joshua Forbes testified that he does not recall whether Mr. Cockerham was straightening out the curves as he drove south on Highway 37. Mr. Cockerham testified that he does not remember how he was driving once he left the parking lot.
Keith Cockerham testified that Mr. Cockerham was driving 60 to 65 miles per hour as he came upon a straight-a-way just south of the fifth curve in the highway that he had just traversed. Keith Cockerham stated that after reaching the straight-away following the curve he “felt the car kind of shift, not a slide all the way over, you know, just a little shift like it had hit something in the road.”[2] Keith Cocker-hamjjfurther testified at deposition, read into the trial record in connection with an expert’s testimony, that he “was leaning forward and [Mr. Cockerham] hit the pothole in the road, and going that fast in the little car, [Mr. Cockerham] couldn’t handle it, and he cut this way, indicating in parenthesis, and then came back around here, indicating again, and down in the ditch [we]went.”[3] Keith Cockerham stated that after Mr. Cockerham’s car went into the ditch, the car hit a tree, and he believes the roof of the car caved in. Keith Cock-erham testified that he lost consciousness. When he regained consciousness, Keith Cockerham discovered he was the only person remaining in the car. Keith Cock-erham exited the car by crawling through a hole in the rear window glass and, once free of the car, walked towards Wade Son-nier’s pick-up truck parked near the accident site.
Joshua Forbes testified that he remembers Mr. Cockerham’s car traveling around the fifth curve and then “kind of hitting what I felt like was a bump in the road. The car kind of — it felt like we ran over some kind of hole or something and then the car veering off the road.” [4] Joshua Forbes next remembers being in the *845 roadway outside of the ear and seeing headlights approaching him. Joshua Forbes testified that he does not remember anything after seeing the headlights until waking up in the hospital two months later.
Toby Scott testified that once Mr. Cock-erham passed Wade Sonnier’s pick-up truck, he lost sight of Mr. Cockerham’s car. Just as they were coming around a curve, Toby Scott testified that he saw broken glass and pieces of blinkers, speaker, and door panels in the road ahead. As Wade Sonnier’s pick-up approached the debris, Toby Scott and Wade Sonnier realized a person might be on the road. Toby Scott testified |sthat Wade Sonnier swerved in an attempt to steer around the person but that the passenger side of the pick-up truck hit the individual on the road, later determined to have been Joshua Forbes.
Sherry Dickerson testified that she was traveling south on Highway 37, from her father’s home located north of Fleniken’s Store towards her house, when she passed the store and saw people she knew in the parking lot.[5] After passing the store and driving a short distance, she noticed Mr. Cockerham’s car in her rear view mirror just as Mr. Cockerham was coming around a curve behind her. Sherry Dickerson stated that she continued to watch Mr. Cockerham’s car through her rear view mirror as Mr. Cockerham approached the site where the accident occurred. She could tell that Mr. Cockerham’s car was out of control by this time because its headlights were “not right. They were— you could tell from looking in your rear view mirror, and that’s all I seen was that the car was not straight on the road. The car was — lights were just every which way.”[6] Sherry Dickerson stated that she watched Mr. Cockerham’s car go off the road and into the ditch and that she quickly turned her car around and went back to the accident site. She parked and immediately saw Joshua Forbes in the roadway. Sherry Dickerson went to Joshua Forbes’ aid and moved him to the side of the road.
Kevin Alvarez, an employee of the Volunteer Fire Department of Pride, Louisiana, was the first individual who was trained as a first responder to arrive at the scene. He testified that he stopped just south of the accident site and saw Joshua Forbes on the side of the road. Kevin Alvarez immediately went to assist Joshua Forbes and stayed with him from that point until Joshua Forbes’ arrival at a hospital. | flWhile in the ambulance with Joshua Forbes, Kevin Alvarez was also asked by the paramedics to assist with Mr. Cockerham, who was taken to the hospital in the same ambulance. Kevin Alvarez testified that Mr. Cockerham was conscious but seemed to be in shock. Kevin Alvarez could see no external injuries on Mr. Cockerham and did not recall smelling alcohol on Mr. Cockerham’s breath.
Thomas Wistrand, an emergency medical technician, arrived at the scene after driving an ambulance there from the Greenwell Springs/Frenchtown station. Thomas Wistrand cared for Mr. Cocker-ham in the ambulance and was in this vehicle when others loaded in Joshua Forbes. Thomas Wistrand testified that he did not smell alcohol on Mr. Cocker-ham’s breath while taking Mr. Cocker-ham’s vital signs and would have noted in his report if he had smelled alcohol. Thomas Wistrand also testified that, while *846 he was caring for Mr. Cockerham and during the entire ride to the hospital, Joshua Forbes was screaming and that “things in the back of the ambulance [were] very stressful.”[7] Thomas Wistrand testified that Mr. Cockerham did not tell him what had happened and confirmed that Mr. Cockerham did not drink any alcohol on his way to the hospital while in the ambulance.
Trooper Christopher Lanoux of the Louisiana State Police (“Trooper Lanoux”) was dispatched to the accident site and arrived at approximately 8:50 p.m. Upon arrival, Trooper Lanoux was advised that those injured in the accident were receiving medical care and that some of the people that were involved in the accident had already been removed from the scene.[8] Mr. Cockerham, the driver of the crashed vehicle, was about to leave in an ambulance at the time Trooper Lanoux arrived. |inTrooper Lanoux walked to the ambulance and observed Mr. Cockerham strapped to a back board inside the vehicle. Trooper Lanoux testified that, at this time, he detected a moderate smell of alcohol coming from Mr. Cockerham.
Thereafter, Trooper Lanoux and his supervisor, who arrived to assist Trooper Lanoux due to the severity of the injuries sustained by the car’s occupants, began an investigation of the accident and remained at the site for several hours. Trooper Lanoux looked for, marked and measured skid marks on the road, interviewed witnesses and took photographs of the scene. Trooper Lanoux and his supervisor walked two hundred yards to the north of the accident site and looked for anything that might have contributed to the accident. After completing his site investigation, Trooper Lanoux traveled to the hospital in Baton Rouge where Mr. Cockerham had been taken. At the hospital, Trooper La-noux interviewed Mr. Cockerham and noted that Mr. Cockerham smelled of alcohol and that his speech was slurred. Trooper Lanoux requested that hospital staff draw blood from Mr. Cockerham so that Trooper Lanoux could send it to the Louisiana State Police laboratory for a whole blood alcohol concentration analysis. Mi1. Cock-erham’s blood was drawn at ten minutes after midnight for this purpose.[9]
In completing his investigation, Trooper Lanoux prepared an accident report recording various road factors. In addition, Trooper Lanoux documented the death of Angela Simonson.[10] Trooper Lanoux also prepared a supplemental accident report which included diagrams, distances and measurements drawn by Trooper Lanoux showing the start and end points of various skid marks on the road. Trooper Lanoux testified that by using the measurements of the skid marks on the road’s surface, he was able to calculate Mr. Cockerham’s speed at the time Mr. Cockerham’s car made the first skid mark on ■ the road. Trooper Lanoux testified that, based on his calculations, he determined that Mr. *847 Cockerham was driving 75 miles per hour at the moment the car’s skid marks started. Trooper Lanoux indicated that he could not compute the speed at which Mr. Cockerham’s car ran into the tree because the car had left the roadway surface by that time. However, Trooper Lanoux testified that the speed must have been significant because the car “broke the tree.”[11]
Trooper Lanoux further testified that he did not recall any potholes in the area of the accident scene, but described a patched area in the roadway north of the accident site. Additionally, Trooper La-noux stated that the shoulders of the highway in the accident area sloped down from the surface of the road and had both grass and trees. He estimated the surface or the bottom of the ditch in the accident area was probably between one foot to one and one-half feet below the surface of the road.
At trial, Trooper Lanoux was asked his conclusions as to how the • accident occurred. Trooper Lanoux stated that “by the evidence that we saw on the scene, it appeared that the driver was southbound on [Highway 37], which is Greenwell Springs Road, at what we estimate was a high rate of speed. He lost control, ran off the road, hit a tree and snapped it off or broke it off. The car spun around and came to rest in the ditch.” [12]

Expert Testimony Regarding Intoxication

At trial, DOTD presented the expert testimony of Dr. Gary Wimbish (“Dr. Wimbish”), a forensic toxicologist, in order to establish Mr. Cockerham’s level of | ^intoxication at 8:00 p.m. on the night of March 19, 1994. Dr. Wimbish testified that in formulating his opinions he reviewed Mr. Cockerham’s medical records compiled in connection with his treatment at the hospital emergency room on the night of the accident. Dr. Wimbish further reviewed the deposition testimony of Mr. Cockerham, Keith Cockerham, Toby Scott and Shane Blankenship. Dr. Wim-bish also interviewed the hospital’s laboratory director and the hospital technician who performed the hospital tests on Mr. Cockerham’s blood as ordered by the hospital emergency room doctor on the night of March 19, 1994. Dr. Wimbish further reviewed all the data at the Louisiana State Police laboratory in connection with the testing of Mr. Cockerham’s blood drawn on the night of the accident for alcohol concentration analysis at the request of Trooper Lanoux.
Dr. Wimbish testified that Mr. Cocker-ham’s medical records indicated that Mr. Cockerham had been administered Ringer’s Lactate, an IV solution, prior to his blood being drawn at the hospital. Dr. Wimbish indicated that while this fluid could effect testing outcomes in other ways, the fluid did not dilute the actual concentration of alcohol in the blood. Dr. Wimbish further testified that the medical records revealed that Mr. Cockerham’s blood was drawn at 9:48 p.m. on the night of the accident for the hospital ordered serum blood alcohol concentration analysis and, again, at 12:10 a.m. that same night for Trooper Lanoux’s whole blood alcohol concentration analysis. Dr. Wimbish testified that Mr. Cockerham’s serum blood alcohol concentration, drawn at 9:48 p.m., was 130 milligrams per deciliter. Dr. Wimbish converted this serum blood alcohol result to reflect the corresponding value of this result if reported in the form of a whole blood alcohol concentration. Dr. Wimbish calculated that Mr. Cockerham had a blood alcohol level of .11 one hour and forty-eight minutes following the aeci- *848 dent. Dr. Wimbish further testified that the Louisiana | ^State Police laboratory report indicated that Mr. Cockerham had a blood alcohol level of .06 at ten minutes past midnight, four hours and ten minutes after the accident.
Using these two results, Dr. Wimbish extrapolated the data backwards to determine Mr. Cockerham’s alcohol toxicity at the time of the accident. In doing so, Dr. Wimbish considered Mr. Cockerham’s age, height and weight, as well as Mr. Cocker-ham’s deposition testimony that he was not a binge drinker, that he only drank socially with friends and usually only on weekends. Dr. Wimbish also took into account the four scientifically-accepted parameters of absorption, distribution, metabolism and excretion which must be considered in making this calculation. Dr. Wimbish testified at trial that “based on calculations that [he] performed, considering absorption, distribution, metabolism, and elimination, [Mr. Cockerham’s] concentration at the time of the accident was a .12 grams percent.”[13]
In further testimony, Dr. Wimbish stated that at a .1% concentration, alcohol affects a person’s perception and reaction time resulting in a release of inhibitions and the oversteering of a curve. Dr. Wim-bish testified that Mr. Cockerham’s alcohol intoxication was a major contributing factor in causing the accident because alcohol interfered with the central nervous system’s ability to integrate information and create a response.
Dr. Wimbish stated that facts were spare concerning Mr. Cockerham’s drinking of alcoholic beverages on March 19, 1994 leading up to the time the accident occurred. Dr. Wimbish testified that the two beers Mr. Cockerham admitted to drinking in the afternoon of the day of the accident had no bearing on Mr. Cocker-ham’s alcohol toxicity at the time of the accident. Dr. Wimbish was of the opinion that to match the blood alcohol concentration levels reported for Mr. | uCockerham’s blood drawn at 9:48 p.m. and 12:10 a.m., Mr. Cockerham would have had to drink twelve beers over the course of the day or at least six beers in the twenty-five minutes prior to the accident. Dr. Wimbish testified that “the scientific facts don’t agree with that’s [the two beers] all the alcohol he consumed. There had to be more alcohol consumed to reach the concentrations found.” [14]
Dr. Wimbish admitted that if Mr. Cock-erham had consumed five beers quickly right before he left the convenience store parking lot, Mr. Cockerham’s blood alcohol concentration could have been between .08% and .09% and, if he had eaten and then consumed the same five beers quickly on a full stomach, Mr. Cockerham’s blood alcohol concentration may have been lower. However, there was no evidence to support this hypothesis.

Expert Testimony Regarding How Accident Occurred

Dr. Oscar Griffith (“Dr. Griffith”), a professor of physics, testified at trial on behalf of Joshua Forbes as an expert in physics and accident reconstruction. Dr. Griffith stated that, in forming his opinions as to how the accident occurred, he reviewed the statements of the parties and the police diagram, and traveled to the accident site in 1998. At that time, the physical evidence of the accident was limited to the tire marks left on the roadway, Trooper Lanoux’s measurements of the tire marks and a picture of the tire marks taken by Mr. Cockerham a week after the accident.
*849 Dr. Griffith noted that the first tire mark was located fairly close to the center line of the road and that it was his opinion that Mr. Cockerham executed an evasive maneuver of some kind just before the first tire mark was made. He stated:
the car wasn’t tracking directly ahead, by tracking I mean it wasn’t traveling exactly in the direction it was pointed. |1fiI think it was canted a little bit to the direction that would be the counter-clockwise direction, that is, it would [cant] a little bit to [sic ] toward the center line as it went off the road, not enough probably to make heavy yaw marks. And I think what the police officer saw was probably maybe a combination of brake marks and yaw marks or the steering effort. Vol. 8, p. 466.
Significantly, Dr. Griffith testified that Mr. Cockerham’s car was out of control before it made the first tire mark and was out of control as it headed off the roadway traveling 7 degrees off the road direction. Mr. Cockerham’s car continued down the embankment in a straight line and began to roll over when it reached the ditch. However, he felt that trees kept the car from rolling over completely and, instead, the car ran into at least one tree, if not more. Dr. Griffith believed that when the car hit the tree(s), the passenger side of the car was sideswiped, causing removal of portions of the car’s passenger side, and the top windshield post on the passenger side was smashed.
Dr. Griffith estimated that Mr. Cocker-ham’s car was traveling at a speed of 60 miles per hour when it made the first tire mark in the road, that the car was traveling at 51 miles per hour when the car left the roadway and that the car was traveling at 47 miles per hour when it impacted with the tree(s).
Dr. Griffith testified that he believed that the significant factors contributing to this accident included the influence of potholes, the shoulder slope at the accident site and the location of the tree line. Dr. Griffith admitted that he did not consider Mr. Cockerham’s actions while driving or whether Mr. Cockerham was intoxicated at the time of the accident in formulating this opinion.
When asked about the pothole or patch in the roadway near the first tire mark, Dr. Griffith surmised that Mr. Cockerham may have perceived the patch as a hazard. Judging by the tire mark in close proximity, Dr. Griffith felt that Mr. Cockerham was 11(Snot impaired and had a quick reaction time to the patch. However, Dr. Griffith admitted that the only basis he had for this supposition was that there was a tire mark near the patch; there was no other evidence to suggest that Mr. Cockerham was surprised by the patch in the road.
Dr. Griffith admitted that the patch was predominantly in the northbound lane. Further, if the first tire mark was traced backward, he admitted the result suggested the possibility that Mr. Cockerham was driving in the oncoming northbound lane and that Mr. Cockerham was straightening out the preceding curve prior to the accident.
Additionally, Dr. Griffith conceded that he did not think the patched pothole threw Mr. Cockerham’s car out of control since Dr. Griffith estimated that a pothole would have to be at least three to three and one-half inches deep and eight feet long to effect the control of a car. Dr. Griffith also testified that he did not believe that the curve located just north of the accident site was a factor.
Dr. Griffith testified that the shoulder slope at the accident site was steep with a measurement of 4.9 degrees within two feet of the road edge and 13.9 degrees for *850 the next three feet. Dr. Griffith also measured the distance to the tree line which he calculated as 11.6 feet from the edge of roadway. Dr. Griffith was questioned about whether Mr. Cockerham could have traversed the slope or recovered the roadway had the shoulder slope been 3:1 or 4:1.[15] Dr. Griffith testified that with a 3:1 slope, a driver could bring his car to a stop on the slope. With a 4:1 slope, a driver could recover from leaving the roadway and return to the travel lane. However, in both instances, Dr. Griffith testified that traversing or recovering a car on a shoulder slope depended on the driver and the driver’s steering and application of brakes.
Dr. Griffith was also questioned about the effect an eight foot shoulder would 117have had on this accident. Dr. Griffith performed geometric calculations to determine that with an eight foot shoulder, Mr. Cockerham may have been able to bring his car to a stop without incident. However, in this scenario, Dr. Griffith assumed a flat shoulder without a slope and no influence of alcohol on the driver.
Mr. Ric Robinette (“Mr. Robinette”), a mechanical engineer licensed in Louisiana, California, Colorado and Michigan, testified as an expert in accident reconstruction on behalf of the DOTD. In order to formulate an opinion, Mr. Robinette reviewed a topographical survey prepared by DOTD employee, Eric Lanier, as well as Trooper Lanoux’s police reports; the depositions of Mr. Clary and Dr. Griffith, plaintiffs experts; and the depositions of John Bou-dreaux, Keith Cockerham, Joshua Forbes, Mr. Cockerham, Shane Blankenship, and Toby Scott. Mr. Robinette also examined the actual scene of the accident, any photographs made available to him by DOTD and Mr. Cockerham’s car. In addition, Mr. Robinette requested that DOTD provide him with an aerial photograph of that portion of Highway 37 where the accident occurred and drove an exemplar 1993 Geo Storm to experience its steering and braking capabilities.
Mr. Robinette testified that Mr. Cocker-ham had traveled only 1.6 miles from the store’s parking lot until his car made the first skid mark. From his review of. the that first skid mark, Mr. Robinette believed that Mr. Cockerham was in the opposing, northbound lane of the highway when he lost control of the car. Mr. Robi-nette testified that the first skid mark straddled the center line and partially extended into the northbound lane. Further, Mr. Robinette estimated that Mr. Cocker-ham was traveling at 73 to 77 miles per hour when the first skid mark was made and that it was at this point that Mr. Cockerham lost control of the car.
Mr. Robinette testified that once Mr. Cockerham lost control of his car, the car | i8began to rotate and that the straight-in skid marks were physical evidence of Mr. Cockerham’s braking since his car was equipped with a proportioning valve and a differential pressure system. Mr. Robi-nette estimated that the car left the roadway surface at 37 to 42 degrees of rotation, relative to the road, traveling at somewhere in the upper 50s miles per hour, went into a 1/4 roll, hit a tree, righted itself as a result of the impact, hit additional trees (up to three more) and spun, sliding to rest. Mr. Robinette indicated that the car traveled 43 additional feet after hitting the first tree with the subsequent tree impacts scrubbing off speed. Mr. Ro-binette further indicated that Joshua Forbes was ejected from the car during the car’s rotation subsequent to the impact *851 of the car’s roof with the tree and that Angela Simonson was ejected as the car came to rest near the tree as the right side of the car was torn off.
Mr. Robinette testified that he felt that Mr. Cockerham’s excessive speed and loss of control of his car caused the accident. Further, he believed that the patches in the roadway near the first skid mark were not contributing factors to Mr. Cocker-ham’s loss of control. Mr. Robinette indicated that the patches may provide a rough ride but that they would not redirect the direction of travel. Further, Mr. Robinette stated that he doubted Mr. Cockerham even saw the patched area since Mr. Robinette believed that Mr. Cockerham’s car was already out of control before reaching that area. Additionally, in his examination of Mr. Cockerham’s ear, Mr. Robinette found no damage to the undercarriage other than a severely bent rod.
Mr. Robinette testified that another factor contributing to the accident was that the occupants of Mr. Cockerham’s car were not wearing their seatbelts. Mr. Ro-binette believed that Angela Simonson and Joshua Forbes would not have been ejected from the car if they had been properly strapped in.
| tflThe Roadway
In the 1920s, the DOTD took many dirt roads into the state highway system and worked to add gravel to the dirt base of these roadways so as to provide a better traveling surface for those living in rural areas. During that time, DOTD acquired a right of passage for the dirt roadways from the adjoining landowners which varied depending on the individual agreements between the parties.
In 1926, DOTD acquired Highway 37 and, in 1927, DOTD work-ordered Project 490-8 which called for the placement of a gravel surface on this highway. DOTD also designed and constructed one 14-foot travel lane from the roadway surface with a five foot shoulder on either side. This project was completed in 1929.
In 1950, the DOTD work-ordered Project 254-03-06 (“1951 project”) for the paving of 10.304 miles of Highway 37 "with asphalt in the area of the accident. Design plans called for the placement of additional gravel on the roadway surface prior to the three-surface application of asphalt, as well as the construction of a 3:1 shoulder slope. The 3:1 shoulder slope was constructed during the grading process prior to the additional gravel being added to the roadway. After the gravel was added, the slope varied, as noted by the project engineer on the as-built plans submitted to DOTD at the completion of this project in 1951. Additionally, plans called for the reworking of the single 14 foot lane into two-10 foot lanes with a one foot shoulder on either side. As-built plans marked by the project engineer indicated that the DOTD’s right-of-way for this project consisted of the existing right-of-way which was 30 feet on either side of the center line of the roadway where there were no fences.
In 1973, the DOTD work-ordered Project 254-03-11 (“1975 project”), affecting 4.55 miles of Highway 37 in the area of the accident and bid the work out to an | ^independent contractor. Design plans called for the road surface to be overlaid after the stabilization of the roadway’s base together with a reshaping of the travel lanes into two-11 foot lanes. The shoulder slope was to be left as it existed. The design plans were included in the contract document and the contractor was given 60 work days to complete the project at a cost of $519,977.04. The completed project was accepted by DOTD in 1975.
*852 Mr. Cockerham testified that he was well-acquainted with Highway 37, as this was the only roadway to and from Clinton, Louisiana, where he had grown up. On the day of the accident, Mr. Cockerham traversed the road on two separate occasions prior to leaving the convenience store parking lot immediately before the accident.

Design and Maintenance of Highway 37 Relating to the Accident

Mr. James Clary, Sr. (“Mr. Clary”), a retired civil engineer licensed in Mississippi, testified on behalf of plaintiff at trial as an expert in highway design, highway safety and highway maintenance. In formulating his opinions, Mr. Clary indicated that he had reviewed the depositions of the parties and witnesses; made a survey of the accident site; personally measured and walked the area and reviewed the police reports, photographs, and DOTD plans and documents relating to the pertinent roadway.
Mr. Clary testified that after his review of these materials, he concluded that Highway 37 had a defect at the accident site which created an unreasonable risk of harm to motorists. Specifically, Mr. Clary stated that the roadway’s safety features of a 3:1 shoulder slope and clear right-of-way constructed in 1951 had been allowed to deteriorate as a result of DOTD’s failure to maintain the area. Further, Mr. Clary characterized DOTD’s work project on that area of Highway 37 in 1975 as a reconstruction project. As such, Mr. Clary claimed that DOTD had failed to comply 12iwith statutorily required design standards consistent with the American Association of State Highway and Transportation Official’ (“AASHTO”) standards and DOTD’s minimum design standards for rural highways applicable to reconstruction projects. These standards included construction of travel lanes with a minimum 12 foot width, eight foot shoulders, at least 4:1 shoulder slopes, and a right-of-way of 150 feet.[16] Mr. Clary testified that DOTD’s failure to maintain, construct properly, or design within proper specifications Highway 37 was, therefore, a cause-in-fact and legal cause of the accident herein.
Mr. Clary based his opinion concerning the shoulder slope and its deterioration on his measurements which showed that at the accident site, the shoulder slope was between 1.88:1 to 1.3:1. Mr. Clary concluded that the variance in the shoulder slope’s ratio in this area from 3:1, as called for in the 1951 project, was a result of DOTD’s failure to maintain the shoulder slope. Mr. Clary further testified that the DOTD’s maintenance manual required that DOTD inspect shoulder slopes on a biweekly basis and restore shoulders to original grade and cross slope by bringing in dirt and building the shoulder slope back up.
Mr. Clary based his opinion concerning the clearing of the DOTD’s right-of-way at the accident site on his presumption that, in 1951, DOTD had cleared and grubbed the i’ight-of-way area. This presumption was based on the 1951 project plan’s note *853 that 18.7 acres had been cleared and grubbed in connection with the 10.304 mile project. Mr. Clary admitted that he did not know what particular areas |2aof the project were cleaned and grubbed or whether the cleaning and grubbing of this highway’s drainage ditches in the project area was included in the 18.7 acre figure. Further, Mr. Clary testified that the DOTD’s maintenance manual provided that DOTD cut grass and trees in the right-of-way and that the first tree that Mr. Cockerham ran into was 10.4 feet away from the edge of the roadway’s pavement. While the 1975 project plans did not show right-of-way, the 1951 project plans indicated an existing DOTD right-of-way 80 feet from the center line of the highway where there were no fences. Mr. Clary did not observe a fence adjacent to Highway 37 when he surveyed the accident area, although he acknowledged that Erie Lanier, a DOTD land surveyor, had identified a fence adjacent to the accident site and had included it on the DOTD survey prepared subsequent to the accident.
Mr. Clary based his opinion concerning Highway 37’s defective safety design on DOTD’s failure to include its own minimum design standards for rural highways regarding lane width, shoulder width, shoulder slope ratio, and right-of-way in its 1975 project plans. Mr. Clary testified that these standards were applicable to the 1975 project because it was a reconstruction project. Mr. Clary believed the 1975 project was a reconstruction of 4.55 miles of Highway 37 solely because a definition of “reconstruction” contained in an appendix to a highway plan and preparation manual indicated the following:
2. Reconstruction
Category A: Complete reconstruction along substantially the present alignment. May include minor revisions to the horizontal geometry and vertical alignment.
Category B: Reconstruct Base and Surfacing: Existing base and surfacing to be reworked, stabilized or replaced. New surface to be constructed. Existing embankment and drainage to remain in place. No right-of-way required.
Category C: Reconstruction and Surface: Same as Category Aj^except that the existing road is not hard surfaced. Highway Plan and Preparation Manual, 197⅛, Plaintiffs Exhibit 1.
Because DOTD’s contractor had ground up the base and added cement to create a more stabilized consistency, Mr. Clary believed that the 1975 project met the definition of “Reconstruction — Category B” contained in the aforementioned handbook. Mr. Clary was unable to identify any other evidence in support of his opinion concerning the nature of the 1975 project.
Mr. Eric Lanier (“Mr. Lanier”), a DOTD land surveyor, testified that he prepared a survey of the accident site. Mr. Lanier testified that he identified a fence line 139 feet north of the accident site running to 15 to 25 feet south of the site. The fence was located in the tree line and appeared to be 20 to 30 years old. The fence was 22 feet from the center line of the roadway and was laying on the ground. Further, Lanier indicated that the remains of the tree he believed was hit by Mr. Cockerham was 10.4 feet from the roadway.
Mr. Gordon Nelson (“Mr. Nelson”), a DOTD employee and the district maintenance engineer for Highway 37 in 1994, testified that DOTD incorporated AASH-TO’s safety standards in its maintenance manual as was practical. Mr. Nelson stated that DOTD used a slope mower to maintain the shoulder and that the shoulder was filled with material if it washed out. Although AASHTO recommended *854 that trees 4 inches in diameter or greater be cut to at least 30 feet from the pavement edge, Mr. Nelson indicated that DOTD did not have funds or the manpower to cut down all trees along state highways, even though trees may be growing from the backslope of the highway ditches and in the right-of-way.
Mr. James A. White, III (“Mr. White”), a DOTD employee and the maintenance superintendent for Highway 37, testified that the highway was inspected on a bihiweekly basis. Mr. White confirmed that DOTD did not cut down all trees along the highway. Mr. White further testified that in restoring a deteriorated shoulder, DOTD would fill it in to its existing slope. Mr. White testified that the shoulder at the accident site was properly maintained because there was no drop-off, the grass was mowed and a fogline was present.
Mr. Richard Savoie (“Mr. Savoie”), a DOTD employee and engineer in the road design department, testified that he reviewed the 1975 project’s plans and identified the work described therein as an overlay or system preservation project. The plans called for stabilization of the roadway base and an overlay of the roadway surface. The plans did not call for work on the shoulder slope.
Mr. Savoie further testified that a reconstruction project took four to five years to develop, involved federal funding and required a topographic survey of the entire route to establish right-of-way. In this project, the design plans were included with the contract, a practice not associated with reconstruction projects. Further, additional right-of-way would normally have to be purchased for a reconstruction project since current standards required a 150 foot width. Mr. Savoie testified that, currently, reconstruction cost $1.5 million per mile and that, in the 1970s, reconstruction cost approximately $500,000 to $600,000 per mile without factoring in the cost of additional right-of-way. Mr. Savoie stated that overlay projects were much cheaper. Because the state maintained 16,700 miles of roadway with a budget of $500 million per year at the time of trial, including federal money, the DOTD could not reconstruct all highways needing maintenance or repair.
Mr. Savoie testified that, in the case of roadways having only a dirt base beneath an asphalt surface, DOTD may choose to reconstruct and stabilize the base and then add a new overlay. However, there was no confusion at DOTD as to ^whether this constituted reconstruction. Mr. Savoie claimed that the only engineer whom he had ever heard characterize this type of overlay as a reconstruction was Mr. Clary. Mr. Savoie testified that the highway plan preparation manual and its definitions did not regulate what constituted an actual reconstruction of a highway.
Mr. Edward R. Wedge, III (“Mr. Wedge”), an employee of DOTD and a design engineer manager, testified that he did not believe that the 1975 project met the criteria for an actual reconstruction of the highway, despite the definition, because the vertical and horizontal geometry of the roadway was not upgraded, no topographic survey was prepared, and no additional right-of-way was purchased. Further, based upon the 1975 project’s estimated cost of $534,000 for 4.55 miles of work, Mr. Wedge indicated that the 1975 project was an overlay project.
Joshua Forbes’ Injuries and Future Prognosis
As a result of the accident, Joshua Forbes suffered a multitude of catastrophic injuries, including the traumatic amputation of his left arm below the shoulder, multiple open fractures of the bones extending into his growth plates in both of his legs, multiple closed fractures in the *855 bones of his right ankle, nerve damage in his right foot, and internal injuries to his stomach and pancreas.
As a result of Joshua Forbes’ extensive injuries, he underwent more than thirty-one surgical procedures as of the date of trial, including the re-plantation of his amputated arm and subsequent removal of that arm eight years later when the arm ultimately failed to function.
Joshua Forbes continues to suffer from numerous physical and psychological problems. At time of trial, he had never been employed, and he anticipated undergoing several additional surgeries recommended by his treating physicians.
^«Proceedings Below
In 1995, Joshua Forbes’ parents each filed a petition for damages on behalf of their child for injuries sustained by Joshua Forbes in the single car accident which occurred on March 19, 1994 near Clinton, Louisiana. Numerous parties were named as defendants in these lawsuits; however, as of trial, only Mr. Cockerham and the DOTD remained as defendants. Prior to trial, Joshua Forbes substituted himself as party plaintiff, having reached the age of majority.
The trial of this case was conducted before a jury on December 6-16, 2004. At the conclusion of trial, the trial court instructed the jury as to the applicable law and provided the jury with an interrogatory form agreed to by the parties. During jury deliberation, the trial court received a note from the jurors with two questions:
(1) Can we place conditions on award?
(2) Can we find a party responsible for the injuries of Josh and not the accident (referring to # 2)? (Emphasis supplied.) Vol. 5, p. 1087.
The trial court determined that the jurors were referring to jury interrogatory number 2 which read:
2. Do you find that the defect that created the unreasonable risk at the accident site was a cause of the accident involving Joshua Forbes? Vol. 5, p. 1088
This jury interrogatory referred back to jury interrogatory number 1 which read:
1. Do you find that Louisiana Highway 37 (Greenwell Springs Road), at the site of this accident, had a defect on March 19, 1994, which created an unreasonable risk of harm. Vol. 5, p. 1088
The trial court responded to the jurors’ questions by informing the jury as follows:
There are no conditions. You just do the award ...
What I intend to do on [the jurors’ question concerning the interrogatory] is have them all come in and tell them that I am going to read the instructions on fault and causation toj^them again, and that is all I can do for a response. Vol. 14, p. 1644.
After subsequent deliberations, the jury requested that they be allowed to hear Toby Scott’s testimony relating to leaving the convenience store parking lot and the accident.
Thereafter, the jury, in a 9 to 3 vote, returned a verdict finding Mr. Cockerham 60% at fault, DOTD 40% at fault and Wade Sonnier 0% at fault in causing Joshua Forbes’ injuries and damages.[17] The jury awarded Joshua Forbes $12,650,234.00 in total damages. On January 14, 2005, the trial court rendered and signed a judgment in accordance with the verdict of the jury.
*856 Pursuant to La. C.C.P. art. 1811, the DOTD timely filed a motion for JNOV and, alternatively, a motion for new trial as to its legal liability in connection with Joshua Forbes’ claims. The trial court granted the DOTD’s motions on April 27, 2005, amending the judgment on the jury’s verdict to reflect a finding that DOTD was not a fault, and that Mr. Cockerham was 100% at fault, in causing Joshua Forbes’ injuries and, alternatively, granting DOTD’s motion for new trial. The trial court indicated in its written reasons the following with regard to DOTD’s liability:
This court has thoroughly reviewed all testimony and evidence pursuant to this long trial that seemingly covered very technical and confusing matters. There can be no doubt that Rodney Cockerham was impaired by alcohol, was very familiar with the roadway but was still driving excessively over the speed limit, and was showing off moments before the accident. On those three points, there is no legitimate evidence that would have caused reasonable jurors to come to any other conclusion of fact.
Likewise, the plaintiff failed to prove, with either legitimate or substantial evidence, that DOTD did, in fact, have a right of way at the fence line and tree line in the area of the accident. Instead, DOTD introduced strong ^evidence in favor of a negative poinU-that the State of Louisiana did not, in fact, own a right of way at the fence line and tree line in that area. Nonetheless, it was not DOTD’s burden to prove that negative. Rather, it was plaintiffs burden to prove the positive fact that DOTD did own a right of way. Plaintiff failed to do so and reasonable jurors could not come to any other conclusion of fact. Furthermore, plaintiff did not prove that DOTD had a duty to cut down trees and fences that were not in their right of way and that they did not own. Furthermore, this court has not reviewed any legitimate or substantial evidence that proved Rodney Cocker-ham would have successfully traversed the shoulder had the slope had a 3 to 1 ratio. Rather, the only legitimate evidence presented was evidence that showed Rodney Cockerham had lost control of his vehicle before he entered upon the shoulder slope. A reasonable juror could not have come to any other conclusion of fact. Vol. 5, p. 1140.
The trial court’s judgment on the DOTD’s motions did not disturb the jury’s damage award to Joshua Forbes or the jury’s finding that Wade Sonnier was free from fault.
Joshua Forbes appealed the trial court’s granting of the DOTD’s motion for JNOV and, alternatively, motion for new trial to the court of appeal. Additionally, National Union, DOTD’s excess insurer, neither named as a defendant in the trial court proceedings nor cast in judgment therein, also perfected an appeal to the court of appeal, pursuant to La. C.C.P. art. 2086,[18] in the event the court of appeal reinstated the trial court’s judgment of January 14, 2005 against DOTD.
On appeal, Joshua Forbes argued that the trial court erred in granting DOTD’s JNOV on the issue of DOTD’s liability and in granting a new trial in the alternative. National Union argued that: (1) the trial court erred in allowing the plaintiffs expert, | aiMr. Clary, to testify as an expert in *857 highway maintenance; (2) the trial court erred in instructing the jury regarding the sudden emergency doctrine; (3) the jury erred in assigning only 60% fault to Mr. Cockerham; and (4) the jury erred in awarding Joshua Forbes excessive damages.
Finding that the trial court erred in granting the JNOV and, alternatively, a new trial, the court of appeal reversed the judgment of the trial court. The court of appeal further found no error in the jury’s verdict and reinstated the trial court’s judgment of January 14, 2005 rendered on that verdict. The court of appeal determined that the assignments of error argued by National Union were without merit.
In response to the court of appeal’s judgment, both DOTD and National Union filed writs of certiorari and/or review with this court, designating assignments of error for this court’s review. DOTD and National Union’s writ applications were granted and consolidated for consideration by this court.[19]
LAW AND DISCUSSION
Both DOTD and National Union raise the following two assignments of error for review by this court: (1) the court of appeal erred in reversing the trial court’s granting of JNOV in favor of DOTD and in affirming the jury’s allocation of 40% fault to DOTD; and (2) the court of appeal erred in its consideration of the trial court’s granting of DOTD’s motion for new trial. National Union further raises the following two assignments of error for review by this court: (1) the court of appeal erred in affirming the jury’s award of $10.8 million dollars in general damages to Joshua Forbes; and (2) the court of appeal erred in its consideration of whether Mr. Clary was properly qualified as an expert in highway maintenance.
1 judgment Notwithstanding the Verdict
The use of JNOV is provided for by La. C.C.P. art. 1811 and is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions. La. C.C.P. art. 1811;[20] *858 see Trunk v. Medical Center of Louisiana at New Orleans, 2004-0181, p. 5 (La.10/19/04), 885 So.2d 534, 537; Joseph v. Broussard Rice Mill, Inc., 2000-0628, p. 4-5 (La.10/30/00), 772 So.2d 94, 99.
|3lIn reviewing a JNOV, an appellate court must first determine whether the trial court erred in granting the JNOV by using the above-mentioned criteria in the same way as the trial court in deciding whether to grant the motion. Trunk, 2004-0181, p. 5, 885 So.2d at 537; VaSalle v. Wal-Mart Stores, Inc., 2001-0462, p. 11-12 (La.11/28/01), 801 So.2d 331, 339. Thus, the appellate court must determine whether the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. If the appellate court determines that reasonable persons might reach a different conclusion, then the trial court erred in granting the motion and the jury verdict should be reinstated. Trunk, 2004-0181, p. 5, 885 So.2d at 537.
In the instant case, the trial court granted a JNOV on the issue of DOTD’s liability because it determined that a reasonable jury could not have found DOTD comparatively at fault for the accident or Joshua Forbes’ injuries. Plaintiff contends that the jury’s verdict was supported by the testimony of the plaintiffs expert, Mr. Clary, that DOTD was clearly negligent in failing to properly design, construct and/or maintain Highway 37 and the adjacent roadside and that such negligence constitutes a cause-in-fact and legal cause of this accident.
DOTD has a duty to maintain the public roadways, including adjacent shoulders and areas in the DOTD’s right-of-way, in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. Campbell v. State, Through Depart. of Transportation and Development, 1994-1052, p. 6 (La.1/17/95), 648 So.2d 898, 901-902; Brown v. Louisiana Indem. Co., 1997-1344 p. 3 (La.3/4/98), 707 So.2d 1240, 1242; Oster v. Dept. of Transp. & Development, 582 So.2d 1285, 1289-91 (La.1991). This duty, however, does not render DOTD the guarantor for the safety of all | jaof the motoring public or the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. Netecke v. State ex rel. DOTD, 1998-1182, 1998-1197 p. 8 (La.10/19/99), 747 So.2d 489, 495. Further, this court has held that DOTD’s failure to design or maintain the state’s highways to modern standards does *859 not establish the existence of a hazardous defect in and of itself. Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1173 (La.1986). Whether DOTD has breached its duty to the public depends on all the facts and circumstances determined on a case by case basis. Campbell, 1994-10522 p. 6, 648 So.2d at 901-902.
The plaintiff argues that the shoulder and slopes of the highway at the accident site were unreasonably hazardous and were a cause-in-fact or legal cause of the accident because DOTD did not meet its own minimum design standards for rural highways and that these modern standards were statutorily required because DOTD undertook reconstruction of a 4.55 mile section of Highway 37 in 1975. This court has held that DOTD does not have a duty to bring old highways up to modern standards unless a new construction or a major reconstruction of the highway has taken place. Aucoin v. State through Dept. of Transp., 1997-1938, 1997-1967 p. 4, (La.4/24/98), 712 So.2d 62, 64; Myers, 493 So.2d at 1173.
In this case, the record shows that plaintiffs only proof that the 1975 project at issue was a reconstruction is the opinion of plaintiffs expert based solely on the definition of “Category B Reconstruct Base and Surfacing” contained in the appendix of a 1974 highway plan and preparation manual. DOTD countered plaintiffs sparse evidence with the testimony of its engineers, Mr. Savoie and Mr. Wedge, who testified that reconstruction projects typically took four to five years to fully develop, would have cost up to $500,000 to $600,000 per mile in 1970s, involved federal lasfunds, required a full topographic survey of the entire route, and required upgrades of the vertical and horizontal geometry of the roadway, as well as purchase of additional right-of-way to satisfy modern design standards. These witnesses further testified that none of these requirements were evident in the 1975 project but that this overlay or system preservation project was contracted out to an independent contractor, was to be completed in 60 work days, cost $519,977.04, did not reflect current right of ways, did not require purchase of additional right of ways, and required no work on the existing shoulder slope.
A reviewing court should afford considerable weight to an administrative agency’s construction and interpretation of its rules and regulations adopted under a statutory scheme that the agency is entrusted to administer, and its construction and interpretation should control unless they are found to be arbitrary, capricious, or manifestly contrary to its rules and regulations. See, Dixie Electric Membership Carp. v. Louisiana Public Service Comm’n., 441 So.2d 1208, 1211 (La.1983); see, also, In the Matter of Recovery I, Inc., 1993-0441 (La.App. 1st Cir.4/8/94), 635 So.2d 690, 696, writ denied, 1994-1232 (La.7/1/94), 639 So.2d 1169.
DOTD’s administrative interpretation of the character of the 1975 project as an overlay project, rather than a major reconstruction, is supported by sufficient evidence such that reasonable persons could not reach a different result. Equating the definition of a “Category B Reconstruct Base and Surfacing” in the 1974 highway plan and preparation manual to a reconstruction project for purposes of imposition of the duty to incorporate current safety standards is not supported by the evidence.
The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. In fact, the vice or defect must be of such a nature as to constitute a dangerous condition that would be reasonably expected *860 to cause 1 ^injury to a prudent person using ordinary care under the circumstances. Lasyone v. Kansas City Southern R.R., 2000-2628 p. 8 (La.4/3/01), 786 So.2d 682, 690.
This court has previously described the unreasonable risk of harm criterion as a guide in balancing the likelihood and magnitude of harm against the social utility of the thing, all the while considering a broad range of social and economic factors, including the cost to the defendant of avoiding the harm, as well as the risk and the social utility of the party’s conduct at the time of the accident. Netecke, 1998-1182, 1998-1197 p. 14-15, 747 So.2d at 498. In every determination, all the circumstances surrounding the particular accident under review must be considered to determine whether DOTD’s legal duty encompassed the risk which caused the plaintiffs damages.[21] Oster, 582 So.2d at 1289.
No one doubts that Joshua Forbes suffered catastrophic injuries of tragic proportions as a result of this accident. However, the DOTD’s duty to provide a reasonably safe highway does not require the DOTD to take every conceivable measure to prevent injuries. A reasonably prudent driver, by definition, would not simultaneously drive at speeds in excess of 20 to 35 miles per hour over the posted speed limit, drive in the opposing lane while straightening out curves, and drive while intoxicated. At the most, the patched condition of the opposite side of the roadway exposed the plaintiff to a momentary risk of harm as Mr. Cocker-ham’s car passed that particular portion of roadway; in fact, Mr. Cockerham and other parties and witnesses in this case did just that as they traversed the roadway throughout the day prior to the accident. However, with Mr. Cockerham driving in such a reckless and intoxicated hastate, every intersection, other vehicle, and object on or near any roadway he chose to drive on posed a tremendous risk of catastrophic injury or death to Joshua Forbes and the other occupants of Mr. Cocker-ham’s car. Sadly, both catastrophic injury to Joshua Forbes and the death of Angela Simonson resulted in this case.
The uncontroverted evidence at trial established that Mr. Cockerham drank enough alcohol the day of the accident to have a .11% blood alcohol concentration level one hour and forty-eight minutes following the accident and a .06% blood alcohol concentration level four hours and ten minutes after the accident. Back extrapolation of these results suggested that at the time of the accident, Mr. Cockerham’s blood alcohol concentration was .12%. Keith Cockerham and Toby Scott testified that Mr. Cockerham drove his car 90 to 100 miles per hour passing another vehicle at some point in his 1.6 mile drive from the parking lot to the accident site, and that at all times during that trip, Mr. Cockerham exceeded the speed limit by at least 20 miles per hour. Mr. Cockerham’s passenger, Keith Cockerham, testified that Mr. Cockerham was straightening out the curves in the road as he was traveling along the highway by driving into the opposing lane. Dr. Griffith, plaintiffs own accident reconstruction expert, testified that Mr. Cockerham’s car was out of con *861 trol at the point near the center line where the first skid mark was detected by Trooper Lanoux and that any effort to control the car on the shoulder and shoulder slope depended upon the driver’s ability to steer and brake. Mr. Robinette, DOTD’s accident reconstruction expert, testified that Mr. Cockerham’s car was out of control prior to the point of the first skid mark and that Mr. Cockerham’s car was out of control before it passed over the patched area located almost wholly in the opposing traffic lane. Trooper Lanoux testified that his review of the evidence indicated that Mr. Cockerham was traveling at a high rate of speed, that he subsequently lost control |Sfiof his car and ran off the road. Sherry Dickerson testified that she could tell that Mr. Cockerham’s car was out of control while it was still on the highway because the car’s headlights were “just every which way.”
Mr. Cockerham’s failure to keep his car on the roadway was the inevitable consequence of his reckless actions. The condition of the shoulder and shoulder slope at the site of the accident did not prevent Mr. Cockerham from regaining control of his car since the car was already out of control before it left the roadway. Moreover, there was no evidence that he attempted to and was prevented from regaining control by any condition of the highway. Mr. Cockerham’s negligent driving was the sole cause of both the accident and Joshua Forbes’ injuries and reasonable persons could not reach a different conclusion. The fact that the trial court in its JNOV determined that Mr. Cockerham was 100% at fault is overwhelmingly supported by the evidence adduced at trial.
CONCLUSION
Based on the foregoing, we find the trial court’s JNOV supported by the evidence in this case and conclude that reasonable persons could not reach a different result. Consequently, the court of appeal erred in reversing the trial court’s judgment which granted the DOTD’s motion for JNOV and, alternatively, new trial. So finding, we reinstate the trial court’s judgment granting the motion for JNOV in favor of DOTD, finding Mr. Cockerham 100% at fault in causing this accident and Joshua Forbes’ injuries.
REVERSED.
CALOGERO, Chief Justice, retired, concurs in part, dissents in part and assigns reasons.
JOHNSON, Justice, dissents and would reinstate the jury verdict.

 Calogero, Chief Justice, retired, participated in this decision, which was argued prior to his retirement.

. Prior to moving back to his mother's house, Rodney Cockerham lived with George and Belinda Forbes, Joshua's parents.

.Vol. 10, p. 892. The record of this case on appeal consists of 15 volumes and numerous exhibits. Reference will be made to the volume number and page number or to the appropriate exhibit number.

. Vol. 8, p. 530-532, quoting Deposition of Keith Cockerham, p. 50, line 7 through answer.

. Vol. 12, p. 1220.

. Sherry Dickerson is George Forbes and Rodney Cockerham's half-sister. She is also Keith Cockerham’s cousin and step-sister. Vol. 10, p. 754.

. Vol. 10, p. 743.

. Vol. 8, p. 447.

. Toby Scott testified that Angela Simonson was aiive after being ejected from Mr. Cocker-ham's car but that she died in an ambulance on the way to the hospital. Vol. 10, p. 884. The record is unclear when and how Keith Cockerham left the scene. Mr. Cockerham and Joshua Forbes rode in the same ambulance to the hospital, which was still on the scene when Trooper Lanoux arrived.

. Rodney Cockerham’s blood had also been drawn at 9:48 p.m. that evening in connection with his emergency medical treatment. The emergency room doctor ordered a serum alcohol concentration analysis of Mr. Cocker-ham's blood, together with other tests. Vol. 10, p. 772.

. Rodney Cockerham pled guilty to negligent homicide charges relating to the death of Angela Simonson in this accident.

. Vol. 9, p. 667.

. Id.

. Vol. 10, p. 795.

. Vol. 10, p. 788.

. The measurement of slope here is given as a ratio of a one-unit vertical drop for three unite of horizontal distance. See Forbes v. Cockerham, 2005-1838 p. 11, 985 So.2d at 98.

. In 1994, at the time of the accident. La. R.S. 48:35 stated the following, in pertinent part:
Section 35. Minimum safety standards of highway design, maintenance, and construction; exemptions.
A. (1) The office of highways of the Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials. Hereafter, the state highway system shall conform to such safety standards.

. Wade Sonnier was the driver of the pickup truck that hit Joshua Forbes on the roadway. Wade Sonnier was dismissed from this case prior to trial.

. La. C.C.P. art.2086 provides:
Art. 2086. Right of third person to appeal
A person who could have intervened in the trial court may appeal, whether or not any other appeal has been taken.

. Forbes v. Cockerham, 2008-0762 (La.9/19/08), 992 So.2d 965; Forbes v. Cockerham, 2008-0770 (La.9/19/08), 992 So.2d 966.

. La C.C.P. art. 1811. Motion for judgment notwithstanding the verdict
A. (1) Not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of judgment under Article 1913, a party may move for a judgment notwithstanding the verdict. If a verdict was not returned, a party may move for a judgment notwithstanding the verdict not later than seven days, exclusive of legal holidays, after the jury was discharged.
(2) A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.
B. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict. If no verdict was returned, the court may render a judgment or order a new trial.
C.(1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.
(3) If the motion for a new trial has been conditionally denied and the judgment is re *858 versed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.
D. The party whose verdict has been set aside on a motion for a judgment notwithstanding the verdict may move for a new trial pursuant to Articles 1972 and 1973. The motion for a new trial shall be filed no later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of the signing of the judgment notwithstanding the verdict under Article 1913. The motion shall be served pursuant to Articles 1976 and 1314.
E. If the motion for a judgment notwithstanding the verdict is denied, the party who prevailed on that motion may, as appellee, assert grounds entitling him to a new trial in the event the appellate court concludes that the trial court erred in denying the motion for a judgment notwithstanding the verdict. If the appellate court reverses the judgment, nothing in this Article precludes the court from determining that the appellee is entitled to a new trial or from directing the trial court to determine whether a new trial shall be granted.
F.The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues.

. Additionally, the physical and financial inability of DOTD to maintain the state's roadways, shoulders and right-of-ways in anything more than a reasonably safe condition has been considered by this court as a factor in determining whether a particular condition complained of presents an unreasonable risk of harm to the plaintiff. Hunter v. Dept. of Transp. and Dev., 1993-235 (La.1993), 620 So.2d 1149, 1153. DOTD employees testified at trial that the agency lacked both the manpower and funding to reconstruct all highways needing some maintenance or repair.