JUDE G. GRAVOIS, Judge.
 

 12Plaintiff, Susan Daigle, filed a petition for damages against the Parish of Jefferson for injuries she sustained in a one-car accident. Ms. Daigle has appealed the jury verdict in favor of the Parish. For the reasons that follow, we affirm.
 

 FACTS
 

 The accident that is the subject of this appeal occurred on June 25, 1999 at approximately 12:30 a.m. at the intersection of Daniels Road and Oakwood Drive in Terrytown, which is in Jefferson Parish. At that time and location, the car that Ms. Daigle was driving crossed through said intersection, climbed a curb, flew over a drainage canal, and came to rest on a street on the opposite side of the canal.
 

 Ms. Daigle’s trial testimony as to the facts surrounding the accident can be summarized as follows. At the time of the accident, Ms. Daigle was dating Wade Mattei, whom she later married. Mr. Mattei was keeping a dog at his apartment that Ms. Daigle had agreed to sit for a friend. At approximately 7 a.m. on June 24, |s1999, Ms. Daigle received a phone call from Mr. Mattei explaining that the dog he had been keeping for her got lost the night before when he let it out to relieve itself. That same night, sometime after 11 p.m., Ms. Daigle drove around in Mr. Mattei’s neighborhood looking for the lost dog. Later, evidently just before 12:30 a.m., Ms. Daigle saw Mr. Mattei’s vehicle. At that point, she drove away because she did not want to talk to him since she was upset with him for losing the dog. She eventually turned onto Daniels Road. Mr. Mattei followed behind her. Ms. Daigle had lived on the West Bank of Jefferson Parish since she was 16 years old and had been to Mr. Mattei’s apartment several times, but had never driven in this direction on Daniels Road prior to the night of the accident.
 

 The next thing Ms. Daigle remembered after turning onto Daniels Road was that she was involved in the accident in question. She never saw a yellow sign or a stop sign. She had no idea what speed she was going at the time of the accident. She felt a jolt, then remembered Mr. Mattei talking to her. She recalled ankle pain. Emergency medical technicians arrived and removed her from the vehicle. She was transferred to West Jefferson Medical Center and then later to the Medical Center of Louisiana, also known as Charity Hospital. She sustained a severe fracture to her ankle in the accident, requiring numerous surgeries, resulting in residual pain and disability.
 

 On cross-examination, Ms. Daigle was presented with a police report stating that at the time of the accident she was attempting to leave the area at a high rate of speed. She admitted that she told the investigating officer that Mr. Mattei was behind her, but did not recall telling the officer that she feared Mr. Mattei. When confronted with the Emergency Medical Services record stating that she was being “chased by boyfriend,” she testified that she did not recall talking to the emergency medical technicians. When confronted with a medical record from the emergency ^department at West Jefferson Medical Center stating “driving high rate of speed fleeing boyfriend she thought might be violent,” she testified that she did not recall speaking to anyone at West Jefferson. She denied that Mr. Mattei was chasing her at the time of the accident. When confronted with a medical record indicating her blood alcohol level sometime after
 
 *58
 
 the accident was .089, she stated that she had not consumed any alcohol the night of the accident and that she did not think it was her blood that was tested for alcohol because of a time discrepancy in the medical records.
 

 Wade Mattei also testified as to the facts of the accident. According to Mr. Mattei, Ms. Daigle was upset when he told her he lost the dog. On the evening of June 24, 1999, he went to a bar and left at about 10:30 or 11:00 o’clock p.m. When he drove to his apartment, he spotted Ms. Daigle’s car. Ms. Daigle turned onto Daniels Road towards Oakwood Drive and he followed her. He tried to call Ms. Daigle but did not speak to her. As Ms. Daigle drove towards the intersection of Daniels Road and Oakwood Drive, he became concerned because he knew the double arrow sign at the end of the street was down. He was fearful that Ms. Daigle would not know the “end of the road was coming.” He then saw Ms. Daigle’s car bounce upward and come to a stop on the street across the canal that is located at said intersection. Mr. Mattei then crossed the canal on the pedestrian bridge nearby and went over to assist Ms. Daigle. He noticed Ms. Daigle’s injured ankle and called 911.
 

 At the time of the accident, Mr. Mattei saw that the double arrow sign that would normally be at the end of the street next to the canal was in fact lying on the ground in the grass next to the canal. He returned to the scene of the accident the next day and took several daytime pictures of the intersection. These photographs | ¿were admitted into evidence. The pictures depict foliage partially obstructing the stop sign at the intersection.
 

 On cross-examination, Mr. Mattei denied that he was chasing Ms. Daigle at the time of the accident. Although Mr. Mattei testified in his deposition that Ms. Daigle was avoiding him, he testified at trial that he did not know she was trying to avoid him. Mr. Mattei admitted that he did not notify anyone with Jefferson Parish when he noticed that the double arrow sign was down days prior to the accident. Mr. Mattei did not recall the time Ms. Daigle was transferred to Charity Hospital.
 

 Deputy Patrick Langley, who investigated the accident on behalf of the Jefferson Parish Sheriffs Office, was not available for trial. His deposition was read to the jury. The police report authored by Deputy Langley was attached to the deposition and published to the jury. Deputy Langley testified that he had worked in the traffic division of the Sheriffs Office for approximately seven of his 14 years as a deputy. He had an independent recollection of this accident. He arrived at the scene while Ms. Daigle was still in the vehicle. He spoke to Ms. Daigle and Mr. Mattei, gathered evidence, and took measurements at the scene. According to Deputy Langley, Ms. Daigle hit the curb at the intersection, cleared the canal, traveling some 40 feet in the air, landed on the other side of the canal, and traveled an additional 115 feet after landing. There were no skid marks, indicating that Ms. Daigle had not made any attempt to stop. Another officer took pictures of the scene and these were admitted into evidence.
 

 Deputy Langley checked Ms. Daigle for sobriety as well as he could and performed the nystagmus gaze test on her. In this test, a subject is asked to follow an object with their eyes and the officer looks for jerking in the eye movements. The result of this test was negative. It did not show signs of impairment. Officer Langley did not smell alcohol on Ms. Daigle.
 

 16According to Deputy Langley, the double arrow sign that had originally been placed between the curb and the canal was found in the grass nearby and was not up
 
 *59
 
 at the time of the accident. He had no idea how long it had been down.
 

 Susan Treadway testified that she has worked in the traffic engineering department for the Parish of Jefferson for thirteen years. This department is responsible for the erection and maintenance of traffic signs. The 1988 Manual on Uniform Traffic Control Devices was followed by her department at the time of the accident in question. The manual did not specify what type of sign should be placed at canal banks. It is standard practice for a black and yellow warning sign with double arrows to be erected at an intersection such as the one at Daniels Road and Oak-wood Drive. Ms. Treadway admitted that the sign was not upright at the time of this accident. The department did not, however, have a record of any complaints being received regarding this sign, nor were there any accidents at this location that indicated that there were any particular problems with this intersection. Accordingly to Ms. Treadway, the Parish does not have a crew that is specifically assigned to look for signs that may be down or obstructed; rather her department depends on notification from residents and other parish workers to let them know when there is a problem with a sign.
 

 Wayne Winkler, an expert in accident reconstruction, recreation, and cause analysis, testified that he inspected this accident scene at night and used the pictures taken by the investigating officers to show that since Daniels Road continues on the other side of the canal, it gives drivers the false impression that the street continues across the canal. He noted that there were no stop signs at the intersections on Daniels Road leading up to Oakwood Drive, which gives drivers the false impression that there is no stop sign at the intersection of Daniels Road at Oakwood Drive. At the time he visited the scene, the double arrow sign was erect 17and was the first thing he noticed at the intersection. Mr. Winkler noted that Daniels Road is a wide street and that generally in Jefferson Parish, the speed limit on streets of this width is 30 miles per hour. Referring to the photograph labeled as plaintiffs exhibit number 29, depicting the intersection from the direction from which Ms. Daigle approached the intersection, which was taken by one of the investigating officers, Mr. Winkler estimated the stop sign was only 50% visible. Mr. Wink-ler estimated this photograph was taken 50 to 60 feet from the curb. He explained that the Manual of Uniform Traffic Control Devices states that the stopping distance for a vehicle traveling at 20 miles per hour is 115 feet; therefore a motorist should be able to see this stop sign from at least 115 feet away. He was of the opinion that on the night of the accident, this stop sign was not visible from at least 115 feet away due to foliage obstructing the sign. He explained that it takes 80 feet for a vehicle traveling at 20 miles per hour to stop. Again referring to exhibit number 29, which he determined was taken 25 feet from the stop sign, Mr. Winkler testified that, in his opinion, Ms. Daigle did not have enough time to stop.
 

 Mr. Winkler estimated that, given the nine inch curb which Ms. Daigle hit and the location where she landed on the other side of the canal, she was traveling between 25 and 30 miles per hour when she hit the curb. He opined that the missing double arrow sign was a major factor in causing this accident. In his opinion, Ms. Daigle’s car was traveling about 25 miles per hour when it landed and then rolled to a stop. According to Mr. Winkler, alcohol was not suspected in this crash given the absence of the smell of alcohol on Ms. Daigle and the negative nystagmus test. Further, in his opinion, Mr. Winkler felt that had Ms. Daigle’s blood alcohol been
 
 *60
 
 .089 three hours after the crash, she would have shown signs of obvious intoxication at the time of the accident since her blood alcohol would have been .14 at the time of the accident. Mr. Winkler stated that if alcohol was used to |xwipe Ms. Daigle’s arm prior to drawing blood for her blood test, this could have caused a false positive in Ms. Daigle’s blood test. Mr. Winkler concluded that the Parish of Jefferson was the cause of this accident for failing to maintain the double arrow sign and failing to remove the obstruction from the stop sign.
 

 On cross-examination, Mr. Winkler stated that he felt that the curb in question along the canal is not an indicator of the end of the street because the curb is the same color as the street. With regard to plaintiffs exhibit number 29, depicting the stop sign, Mr. Winkler was of the opinion that this picture was taken with a flash, and accordingly the lighting for this photo is not representative of what Ms. Daigle saw on the night of her accident. Mr. Winkler felt that the evidence disputes the allegation that Ms. Daigle was being chased at a high rate of speed at the time of the accident. The evidence indicates to him, rather, that she was traveling at 25 miles per hour at the time of the accident. Finally, Mr. Winkler testified that there were five accidents at this intersection in the year prior to Ms. Daigle’s accident which should have prompted the Parish to perform a study of this intersection.
 

 After its Motion for Directed Verdict was denied, the Pai'ish presented the testimony of Dr. William George, an expert pharmacologist and toxicologist. Dr. George was of the opinion that, based on the report of a blood alcohol level of .089 three hours after the accident, Ms. Dai-gle’s blood alcohol level was .13 at the time of the accident. Dr. George concluded that alcohol was a significant factor in the cause of this accident. On cross-examination, Dr. George testified that a person with a blood alcohol level of .13 would not necessarily smell of alcohol; rather whether a person’s breath smelled of alcohol would depend on the type of alcoholic beverage consumed.
 

 |9Fred Davidson, an expert in accident reconstruction, testified that he gathered evidence from the police report, photographs and depositions, and concluded that Ms. Daigle was traveling at a speed of 50 to 55 miles per hour at the time she hit the curb. Mr. Davidson disagreed with the calculations used by Mr. Winkler in estimating the vehicle’s speed, explaining that he used a different area of the vehicle to determine the distance traveled, and a different angle of takeoff to arrive at his conclusions. Mr. Davidson stated that a 10 to 12 inch long and 2 to 3 inch deep section of the curb was broken by the impact. Mr. Davidson was of the opinion that Ms. Daigle’s vehicle was traveling at 37 to 38 miles per hour as it slid to its final resting spot.
 

 Mr. Davidson referred to the photograph of the intersection, plaintiffs exhibit number 29, in finding the curb was visible from about 150 feet away. He disagreed with Mr. Winkler’s opinion that the photograph was taken 25 feet from the stop sign. He based this on the fact that the expansion joints depicted in the picture are 27 feet apart. He also noted that the photograph was taken from a standing position. A driver would, however, be at a lower angle. It was his opinion, therefore, that well over 50% of the stop sign would be visible at a distance of 60 feet, which is 90 to 100 feet from the curb. Mr. Davidson further explained that a car’s headlights shine 150 feet in front of the car, meaning that the curb and grass canal bank would have been illuminated by the headlights. Mr. Davidson was of the opin
 
 *61
 
 ion that 100% of the fault of this accident was due to the actions and inactions of Susan Daigle.
 

 Susan Treadway, when called back to the stand by the Parish, testified that the Manual of Uniform Traffic Control Devices did not require that a double arrow sign be placed at an intersection such as this. She explained that the stop sign was the primary sign at the intersection. She further explained that there were only | inthree accidents at this intersection in the year prior to Ms. Daigle’s accident and that none of these accidents were similar to her accident. From January 1999 through the date of the accident in question, there were no complaints made to the Parish regarding signs at this intersection.
 

 On cross-examination, Ms. Treadway acknowledged that she did not know how long the double arrow sign had been down, and that the Manual on Uniform Traffic Control Devices states that drivers should have a clear view of the stop sign at an intersection.
 

 In rebuttal, the deposition testimony of Dr. Martin Ferris was read to the jury. Dr. Ferris is the medical director of the laboratory at West Jefferson Medical Center. He held this position in 1999. According to Dr. Farris, the specific person who drew Ms. Daigle’s blood for the blood alcohol test was not listed in the medical records introduced into evidence. There are archived records at the hospital that would state the name of the person who drew Ms. Daigle’s blood. Dr. Ferris also stated that it is extremely unusual to have blood drawn from the wrong patient. He explained that alcohol would have been used to wipe Ms. Daigle’s arm prior to the blood being drawn, but that this would not have changed the results of Ms. Daigle’s blood test because their lab does not test for that type of alcohol. Dr. Ferris concluded that it is more probable than not that the results in the medical records are from Ms. Daigle’s blood.
 

 Mr. Winkler also took the stand in rebuttal. He disagreed with Mr. Davidson’s calculations because, in his opinion, Mr. Davidson’s calculations assume the front and back tires all left the ground at the same time, when in reality the front tires left the ground first, while the back tires were still on the ground. Mr. WinMer was of the opinion that if Ms. Daigle had been traveling at 50 miles per hour at the time of the accident, her car would have broken apart upon impact.
 

 InAfter being instructed by the trial judge, the jury was given interrogatories to be answered. The first interrogatory, asking if the alleged defects in the roadway were in the custody or control of the defendant, was stipulated to by the parties. The second interrogatory, asking whether the roadway presented an unreasonable risk of harm in the June 25, 1999 accident, was answered negatively by the jury. Based on this finding by the jury, the trial judge rendered judgment in favor of the Parish, dismissing the Parish from this matter. This appeal followed the trial court’s denial of Ms. Daigle’s Motion for Judgment Notwithstanding the Verdict.
 

 FIRST ASSIGNMENT OF
 
 ERROR—
 
 UNREASONABLE RISK OF HARM
 

 In her first assignment of error, Ms. Daigle argues that a reasonable jury could not have found that the defects in the roadway did not present an unreasonable risk of harm to her based on the evidence presented that the double arrow sign was laying on the ground and that the stop sign was obscured by foliage. In support of this argument, Ms. Daigle cites the testimony of her expert, Mr. Winkler, that the intersection in question was unreasonably dangerous as it existed on the night of the accident. She argues that the Manual on Uniform Traffic Control De
 
 *62
 
 vices, which the Parish’s traffic engineer testified it follows, mandates that traffic control devices must give adequate time for the driver to properly respond. Mr. Winkler testified that the stop sign, which was obscured by foliage, did not give Ms. Daigle adequate time to respond. Ms. Daigle further argues that the absence of the double arrow sign and the fact that Daniels Road continues on the other side of the canal gives the false illusion that the roadway continued over the canal. Ms. Daigle concludes that since the Parish offered no evidence to rebut this testimony, the jury was manifestly erroneous in determining 112that the alleged defects in the roadway did not create an unreasonable risk of harm at the time of the accident in question.
 

 The Parish responds that the jury’s verdict was supported by the evidence, especially the photographs of the accident scene, particularly plaintiff’s exhibit number 29, which obviously led the jurors to conclude that this was not an unreasonably dangerous intersection. The Parish points out that the photographs indicate that the stop sign controlling this intersection, as well as the curb running across the middle of the street, are clearly visible. The Parish cites the testimony of its expert, Mr. Davidson, who concluded that the sole cause of this accident was the actions and inactions of Ms. Daigle, noting that the curb was clearly visible to Ms. Daigle over 90 feet before she reached it. The Parish points out the testimony of Deputy Langley that he disagreed with Ms. Daigle’s counsel’s statement that this intersection gave a false impression that the road continued over the canal. The Parish contends that the testimony that Ms. Daigle was speeding and being chased by Mr. Mattei, as well as the medical records indicating a blood alcohol level of .089 three hours after the accident, support the jury’s finding. Finally, the Parish argues that the testimony of Ms. Treadway that the stop sign was the primary sign at the intersection, that the Parish had no notice that the double arrow sign was down, and that there were no accidents similar to Ms. Daigle’s accident at this intersection, also support the jury’s finding.
 

 LSA-R.S. 9:2800, which is applicable herein, provides in pertinent part:
 

 A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
 

 B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the | ^particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
 

 In order to recover under this statute, a plaintiff must prove that: (1) the defendant owned or had custody of the thing that caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; (3) the defendant had actual or constructive knowledge of the defect or unreasonable risk of harm and failed to take corrective action within a reasonable time; and (4) causation.
 
 Wilson v. City of New Orleans,
 
 95-2129 (La.App. 4 Cir. 4/30/97), 693 So.2d 344,
 
 writ denied,
 
 97-1701 (La.10/13/97), 703 So.2d 613.
 

 Whether the condition of a road is unreasonably dangerous is a question of fact and should only be reversed if it is manifestly erroneous or clearly wrong.
 
 Rizzuto v. State, Dep’t of Transp. and
 

 
 *63
 

 Dev.,
 
 2002-1687 (La.App. 4 Cir. 3/17/04), 870 So.2d 1034, 1041. The manifest error-clearly wrong standard authorizes an appellate court to reverse a trial court’s factual finding only if we find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong.
 
 Stobart v. State, Dep’t of Transp. and Dev.,
 
 617 So.2d 880, 882 (La.1993). This standard requires that the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding; rather, the reviewing court must review the entire record to determine whether the trial court’s finding was clearly wrong or manifestly erroneous.
 
 Id.
 
 The appellate court must determine whether the fact finder’s conclusion was reasonable, not whether the fact finder was right or wrong.
 
 Id.
 
 Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.
 
 Id.
 
 Where two | ^permissible views of the evidence exist, the fact finder’s choice between them cannot be clearly wrong.
 
 Id.
 

 In the case at bar, Ms. Daigle was required to prove that the alleged defect created an unreasonable risk of harm. “The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. In fact, the vice or defect must be of such a nature as to constitute a dangerous condition that would be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances.”
 
 Forbes v. Cockerham,
 
 08-0762 c/w 08-0770 p. 33, (La.1/21/09), 5 So.3d 839, 859. Thus, Ms. Daigle had to prove to the jury that the intersection of Daniels Road and Oakwood Drive presented an unreasonable risk of harm to a person using ordinary care, and that action by the Parish of Jefferson could have prevented this harm.
 

 A review of the record in its entirety indicates this jury’s finding is not manifestly erroneous or clearly wrong. Ms. Daigle presented the testimony of Mr. Winkler that the intersection created an unreasonable risk of harm because the double yellow sign was not in place and the stop sign was partially obstructed. Mr. Winkler also testified that Ms. Daigle was traveling at approximately 25 miles per hour which was five miles faster than the posted speed limit. The Parish, however, presented testimony that a double yellow sign was not required at this intersection and that the stop sign was not obstructed. The Parish also presented testimony that Ms. Daigle was traveling well over the posted speed limit and was intoxicated at the time of the accident. Thus, the jury was presented with two opposing causes of the accident in question: that the accident occurred because the roadway presented an unreasonable risk of harm, or that the accident occurred due to Ms. Daigle’s failure to use ordinary care. The jury found the latter. The jury obviously gave more credibility to the testimony and evidence presented by the Parish over that | ^presented by Ms. Daigle. We accordingly find no error in the jury’s finding that the roadway in question did not present an unreasonable risk of harm at the time of the accident in question.
 

 SECOND ASSIGNMENT OF ERROR-MOTION IN LIMINE
 

 In her second assignment of error, Ms. Daigle argues that the trial court erred in denying her motion
 
 in limine
 
 and, as such, in improperly allowing the introduction of a medical record purporting to show her blood alcohol content. She argues these records are defective because there is no signature of the person responsible for drawing the blood sample. She
 
 *64
 
 contends that under LSA-R.S. 13:3714,
 
 [1]
 
 the person responsible for creating the records must be available for cross-examination, and that, because the records do not indicate the person drawing the blood and the person performing the test, the records cannot speak for themselves as per the statute and therefore should not have been admitted.
 

 Ms. Daigle further argues that the time discrepancies in the medical records wherein the records reflect that she was transferred to Charity Hospital at 3:10 a.m. and the blood to determine alcohol level was drawn at 3:21 a.m. makes the results of the test unreliable.
 

 11fiThe Parish responds that the records were properly admitted because they were certified records admitted in accordance with LSA-R.S. 13:3714. The Parish further argues the records were admissible as an exception to the hearsay rule under
 
 Judd v. State, Dept. of Transp. and Dev.,
 
 95-1052 (La.11/27/95), 663 So.2d 690. The Parish contends that the medical records indicate that the lab tests were completed at 3:21 a.m., not that the blood was drawn for these tests at 3:21 a.m. The Parish states that the Charity Hospital records indicate that Ms. Daigle did not arrive at Charity until after 6:00 a.m., and to believe Ms. Daigle’s argument would indicate it took over three hours to transfer Ms. Dai-gle from West Jefferson to nearby Charity-
 

 The specific medical record which establishes Ms. Daigle’s blood alcohol level several hours after the accident is contained in the medical records obtained from West Jefferson Medical Center. These records were submitted into evidence by Ms. Dai-gle as well as the Parish. These records were certified and thus admissible under R.S. 13:3714 A. Further, Dr. Farris, the director of the laboratory at West Jefferson Medical Center, testified that the name of the individual drawing the blood was available in the archive records of the hospital. It is apparent from the record that the deposition of Dr. Farris was taken while this trial was in progress. This accident occurred in 1999 and the trial was not held until 2007. Certainly, Ms. Daigle was in possession of these records well before the trial and based on the testimony of Dr. Farris could have obtained the name of the individual who drew the blood.
 

 Further, although Ms. Daigle argues that the results were unreliable because of the time discrepancies, this information
 
 *65
 
 was brought to the attention of the jury. Additionally, the jury was able to hear the testimony of Ms. Daigle that she did not 117consume alcohol in the hours preceding the accident, and that of the investigating officer that he did not smell alcohol on Ms. Daigle.
 

 Moreover, as part of Ms. Daigle’s certified medical records, the record of her blood alcohol was admissible under
 
 Judd, swpra,
 
 which held that certified hospital records are admissible into evidence without the laying of any foundation beyond a showing of certification.
 

 Ms. Daigle also argues that the records were irrelevant and their admission was unfairly prejudicial under La. C.E. art. 403. She contends there was ample testimony to indicate she was not intoxicated. Mr. Winkler concluded that Ms. Daigle was not intoxicated because Deputy Langley noted a negative nystag-mus test and there were no notations that there was odor of alcohol or that Ms. Daigle was visibly intoxicated. This argument ignores the holding that certified medical records are admissible as prima facie proof of their contents under LSA-R.S. 13:3714. Ms. Daigle attempted, although unsuccessfully, to rebut this evidence with her own testimony, and that of Mr. Winkler, and Deputy Langley.
 

 For the above-stated reasons, we find the trial court did not err in admitting the medical record containing Ms. Daigle’s blood alcohol level.
 

 THIRD ASSIGNMENT OF ERROR-EVIDENCE OF FOLIAGE TRIMMING
 

 In her third assignment of error, Ms. Daigle contends the trial court erred in excluding evidence of the Parish’s subsequent act of trimming the foliage around the stop sign immediately following the accident.
 
 [2]
 
 While acknowledging that subsequent remedial measures is inadmissible to prove liability, Ms. Daigle argues 11sthat this evidence was admissible to show the Parish had control over the foliage obscuring the stop sign, had knowledge of the defect, that the precautionary measures were feasible and to rebut the Parish’s contentions that the stop sign was not obscured.
 

 The Parish responds that the photograph of the intersection accurately depicts the intersection at the time of the accident and shows the condition and visibility of the stop sign. The Parish contends that Ms. Daigle’s accident was the first notice that there may be a problem at the intersection and that the branches that partially hung over the stop sign were trimmed. The Parish concludes this was clearly a subsequent remedial measure and inadmissible under La. C.E. art. 407.
 

 The jury was presented with several photographs of the intersection showing foliage partially obstructing the stop sign. These photographs show that although the stop sign is partially obstructed, the sign can be clearly seen as testified to by Mr. Davidson. The jury was able to clearly see the appearance of the intersection as it appeared on the night of the accident, as well as the day time photographs taken by Mr. Mattei. The photographs admitted into evidence show that the stop sign was partially obscured by foliage. The jury obviously concluded that this did not present an unreasonable risk of harm to Ms. Daigle at the time of the accident in question.
 

 We find that the Parish’s subsequent act of trimming the foliage around the stop sign immediately following the accident
 
 *66
 
 was clearly a subsequent remedial measure and therefore inadmissible under La. C.E. art. 407. This assignment of error is accordingly without merit.
 

 |
 
 FOURTH AND FIFTH ASSIGNMENTS OF ERROR
 
 — JURY
 
 CHARGES AND CUMULATIVE ERRORS
 

 In her fourth assignment of error, Ms. Daigle argues the court erred in excluding a jury charge on constructive notice. In light of the above holding that there is no manifest error in the jury’s finding that the alleged defects in the roadway did not present an unreasonable risk of harm, this assignment of error is moot.
 

 Likewise, having found no error in the trial court’s evidentiary rulings, Ms. Dai-gle’s fifth assignment of error arguing that the trial court’s cumulative errors denied her right to a fair trial, is also moot.
 

 CONCLUSION
 

 For the foregoing reasons, the judgment of the trial court in this proceeding is hereby affirmed.
 

 AFFIRMED.
 

 [1]
 

 . LSA-R.S. 13:3714 provides in pertinent part:
 

 A. Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or a copy of a bill for services rendered, medical narrative, chart, or record of any other state health care provider, as defined by R.S. 40:1299.39(A)(1) and any other health care provider as defined in R.S. 40:1299.41(A), certified or attested to by the state health care provider or the private health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.
 

 C. Notwithstanding the provisions of this Section to the contrary, in any civil action, whenever the blood alcohol concentration (BAC) test results are from a source other than the office of state police crime laboratory of the Department of Public Safety and Corrections, if a timely challenge is raised in a court of competent jurisdiction to the authenticity, reliability, or accuracy of the test results, or to the lack of a proper foundation for the admissibility of the test results into evidence, the court shall conduct a hearing to determine the validity of the challenge and, if it finds that the challenge is well-founded, the court may rule the blood alcohol concentration test results inadmissible....
 

 [2]
 

 . This Court has previously found the trial court did not abuse its discretion in excluding this evidence.
 
 Daigle v. the Parish of Jefferson,
 
 06-968 (La.App. 5 Cir. 1/12/07) (unpublished writ disposition). Plaintiff’s writ to the Supreme Court on this matter was likewise denied.
 
 Daigle v. Parish of Jefferson,
 
 07-0307 (La.2/27/07), 949 So.2d 427.